# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 2, 2012

Lyle W. Cayce
Clerk

No. 10–50845

PATRICIA ANN ELLIS, Individually, and as Next Friend of A.M.G. and R.T.G. and as Executrix of the Estate of Melissa Busch; CORALON BUSCH, Individually and as Next Friend of C.L.A.B. and M.W.L.B.,

Plaintiffs - Appellees-Cross Appellants

v.

UNITED STATES OF AMERICA,

Defendant - Appellant - Cross Appellee

Appeals from the United States District Court
for the Western District of Texas

Before BARKSDALE, GARZA, and ELROD, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this Federal Tort Claims Act case arising out of medical malpractice that led to the death of Melissa Busch ("Ms. Busch"), the United States Government ("Government") and Ms. Busch's family members Patricia Ann Ellis, Coralon Busch, and Ms. Busch's children (together, "Plaintiffs") cross-appeal the district court's judgment.

The district court refused to reduce the Plaintiffs' damages award by amounts the Government claimed NE Methodist Hospital ("NE Methodist") or Ms. Busch were liable. The district court also limited Plaintiffs' recovery for

No. 10–50845

household services to the Texas Medical Liability Act's $250,000 noneconomic damages cap. We AFFIRM in part and REVERSE and REMAND in part.

# I

## A

This case arises out of repeated medical misdiagnoses that led to the untimely death of Melissa Busch. The Government's conceded medical malpractice spanned two years, from 1997, when Ms. Busch complained of lingering foot pain to doctors at the Brooke Army Medical Center ("BAMC") at Fort Sam Houston in San Antonio, Texas, to 1999, when doctors at NE Methodist, a private, non-governmental medical institution, also in San Antonio, diagnosed Ms. Busch with the synovial foot cancer that eventually killed her.

Ms. Busch's family's negligence claim against BAMC stems from two visits Ms. Busch made to BAMC on January 8 and 9, 1997. Ms. Busch had first visited BAMC for care to her left foot in August 1996 after she hurt it while playing with her children. She returned to BAMC in January 1997 because the pain and swelling in her left foot persisted despite her compliance with treatment. A physician's assistant at BAMC first gave Ms. Busch an X-ray and a bone scan. After both tests ruled out a stress fracture, the physician's assistant instructed Ms. Busch to pursue an orthopedic consultation. Although the assistant did not tell her so, the orthopedic consultation was intended to further investigate the cause of the pain and swelling; the consult likely would have revealed cancer if present. Ms. Busch sought an orthopedic appointment with BAMC, but BAMC employees told her no appointments were immediately available. They placed her on a waiting list and told her they would contact her to set up an appointment. But they did not, and Ms. Busch did not receive an orthopedic consultation.[1]

---

[1] BAMC apparently scheduled an appointment for Ms. Busch eighteen months later but failed to notify her.

No. 10–50845

By the end of that month, Ms. Busch divorced her husband and as a result, lost access to military health benefits. She was ineligible to visit BAMC for further treatment. She did not return to BAMC or seek medical advice or treatment from BAMC again.

Eight months passed. Ms. Busch re-injured her left foot in September 1997 after a pipe fell on her foot while she was at work. She visited the ER at NE Methodist for treatment. NE Methodist's doctors failed to advise her that they observed a "retained foreign body" in her X-ray. Ms. Busch made no mention to NE Methodist physicians that BAMC had previously advised an orthopedic consultation.

Increased swelling in her foot compelled Ms. Busch's return to the NE Methodist ER only three days later. Ms. Busch complained of "continued redness, pain, and swelling" in her left foot. The doctor who treated her at the ER could not recall later if she consulted the radiological report or viewed the X-rays of Ms. Busch's foot from Ms. Busch's visit to NE Methodist three days before. The ER doctor did recall that Ms. Busch failed to "relate any information about a prior injury or prior swelling."

The ER doctor suspected that Ms. Busch had a skin infection on her left foot that necessitated a quick follow-up appointment. The doctor advised Ms. Busch to follow up with a visit to a private physician or return to the ER within seventy-two hours and gave Ms. Busch the names of physicians to contact. But Ms. Busch failed to obtain follow-up care for her foot even though pain and swelling persisted. The doctor later testified, "We can only tell them [to follow up]. We can't take them to their appointment."

Over the next year and a half, Ms. Busch continued to see private doctors for medical care unrelated to her foot. She became pregnant in 1998 and delivered a healthy child that October.

No. 10–50845

Ms. Busch did not again seek treatment for her foot until January 8, 1999. A physician's assistant initially saw her and referred her to a podiatrist. The podiatrist located a tumor in Ms. Busch's foot, and after further examination diagnosed Ms. Busch with synovial sarcoma, a rare, serious cancer. Due to delays in diagnosis, treatment was aggressive. Doctors amputated Ms. Busch's left leg within a month. Ms. Busch ended a pregnancy shortly after her amputation so that she could begin chemotherapy. Her efforts to evade the cancer were futile. Over the next several years, the cancer recurred despite repeated bouts of chemotherapy and radiation. It invaded Ms. Busch's bones and lungs. It killed her in October 2005. Ms. Busch was only thirty-three. Among her survivors were her husband, Coralon Busch, whom she married in 1999; their two children; two children from her first marriage; and Ms. Busch's mother, Patricia Ellis.

**B**

Before her death, Ms. Busch sued NE Methodist in Texas state court in 1999, *see Busch v. Lopez, et al*, No. 99-CI-16625 (Dist. Ct., Bexar County, Tex. 1999), alleging negligence because NE Methodist never told her that X-rays taken in September 1997 revealed a retained foreign body in her left foot. Ms. Busch and NE Methodist settled Ms. Busch's claim without a trial in March 2002. Ms. Busch sued the Government under the Federal Tort Claims Act in August 2003, charging negligence based on BAMC's failures to schedule an orthopedic consultation in January 1997 and warn Ms. Busch of the potential urgency of her condition, both of which in turn caused a two-year delay in her cancer diagnosis and treatment.[2]

After Ms. Busch's death in October 2005, Ms. Busch's mother substituted as plaintiff in Ms. Busch's federal lawsuit, and transformed Ms. Busch's

---

[2]  She first filed a timely administrative claim with the Army in September 1999. *See* 28 U.S.C. §§ 2401(b), 2675.

No. 10–50845

negligence claim into one for wrongful death.  Ms. Busch's mother, along with Ms. Busch's husband and minor children, also separately sued the Government. The district court consolidated these cases.  The Government designated NE Methodist and physicians treating Ms. Busch there as responsible third parties under TEX. CIV. PRAC. & REM. CODE ANN. § 33.004, contending that the district court should mitigate the Government's liability by the percentage of fault properly allocated to NE Methodist.

The district court reached the merits of Plaintiffs' consolidated claims in a four-day bench trial.  The district court held the Government liable for Ms. Busch's death, finding that although a BAMC employee recognized that Ms. Busch had a potentially serious medical problem and directed her to seek an orthopedic consultation, BAMC employees negligently failed to arrange the appointment for her or inform her of the urgency of the consult.

The district court refused to mitigate the Government's liability by the responsibility allocable to NE Methodist; it held that the Government failed to show that NE Methodist shouldered any responsibility for Ms. Busch's condition. The district court further held that Ms. Busch was not comparatively negligent by failing to follow up on her care at either hospital.  The district court awarded Plaintiffs significant damages but subjected their request for household damages to the Texas Medical Liability Act's $250,000 cap on noneconomic damages.

Both parties appealed.  The Government identifies two issues for our review:  (1) whether the district court erred in holding the Government alone liable for the failure to detect cancer, when Ms. Busch was seen with similar symptoms at both BAMC and NE Methodist and neither hospital discovered or diagnosed the cancer; and (2) whether the district court erred in holding that Ms. Busch was not comparatively negligent for her failure to seek medical assistance after a physician's assistant at BAMC and physicians at NE Methodist recommended that she seek additional care.

5

No. 10–50845

The Plaintiffs identify one issue for our review: whether the district court erred by excluding Plaintiffs' damages for household services from the economic damages award, thus limiting their recovery for household services to the Texas Medical Liability Act's $250,000 noneconomic damages cap.

We review the district court's factual findings in a bench trial for clear error. *See, e.g.*, *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 294 (5th Cir. 2009). We review the district court's legal conclusions de novo. *Id.*

## II

The Federal Tort Claims Act ("FTCA") holds the Government liable for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act" of federal employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). The FTCA imposes liability on the Government "in accordance with the law of the place where the act or omission occurred," *id.*, making the Government liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674; *accord* 28 U.S.C. § 1346(b)(1). Because the malpractice central to this case took place exclusively in Texas, Texas law applies. *See* 28 U.S.C. § 1346(b)(1).

## A

The Government contends that the district court erred in holding the Government alone liable for the failure to detect Ms. Busch's cancer. Specifically, the Government contends that NE Methodist should also be held liable for Ms. Busch's death.

The district court allowed the Government to designate NE Methodist and physicians who treated Ms. Busch there as "responsible third parties" under TEX. CIV. PRAC. & REM. CODE ANN. § 33.004.[3] Texas law instructs the trier of fact

---

[3] A "responsible party" is "any person who is alleged to have caused or contributed to causing in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, by other conduct or

to allocate to responsible third parties any damages attributable to them. *See id.* § 33.003(a)(4). Here, the district court concluded that the Government failed to show that NE Methodist or the physicians treating Ms. Busch there were negligent and thus failed to show that they are responsible third parties. We agree.

The Government focuses its appeal only on the negligence of NE Methodist.[4] To establish the negligence of NE Methodist as a responsible third party, and thus that it shares liability for damages, the Government must show NE Methodist committed medical malpractice. Under Texas law, to show NE Methodist's malpractice, the Government must show (1) NE Methodist's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation. *Hannah v. United States*, 523 F.3d 597, 601 (5th Cir. 2008). To establish causation, the Government must produce evidence that by a "reasonable medical probability" or a "reasonable probability," NE Methodist caused, at least in part, Ms. Busch's injuries. *See Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010). This means "simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Id.* at 533.

"[E]xpert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of [the finder of fact]." *Guevara v. Ferrer*, 247 S.W.3d 662, 665 (Tex. 2007); *see Hannah*, 523 F.3d at 601 ("'Unless the mode or form of treatment is a matter of common knowledge or is

---

activity that violates an applicable legal standard, or by any combination of these." TEX. CIV. PRAC. & REM. CODE ANN. § 33.011(6).

[4] The Government asserts on appeal only that NE Methodist—not any physicians who treated Ms. Busch there—is a responsible third party. The Government therefore has waived any appeal of the district court's holding to the extent it applies to the liability of physicians who treated Ms. Busch at NE Methodist. *See* FED. R. APP. P. 28(a)(9)(A); *Alameda Films SA de CV v. Authors Rights Restoration Corp., Inc.*, 331 F.3d 472, 483 n.34 (5th Cir. 2003).

No. 10–50845

within the experience of the layman, expert testimony will be required to meet this burden of proof.'" (quoting *Hood v. Phillips*, 554 S.W.2d 160, 165–66 (Tex. 1977))).

> It is not enough for an expert simply to opine that the defendant's negligence caused [the plaintiff's] injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. [The Texas Supreme Court has] rejected expert opinions not grounded in a sound evidentiary basis: [I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. [A] claim will not stand or fall on the mere ipse dixit of a credentialed witness. When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that in medical probability the injury was caused by the defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion.

*Jelinek*, 328 S.W.3d at 536 (internal quotation marks and citations omitted).

Also relevant to this issue on appeal is Federal Rule of Evidence 607, which instructs that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness."[5] Rule 607 replaced the common law "vouching rule," which prevented a party calling a witness from impeaching that

---

[5] Rule 607 was amended on December 1, 2011 for clarity only. It now reads, "Any party, including the party that called the witness, may attack the witness's credibility."

No. 10–50845

witness. *See McConville v. Fla. Towing Corp.*, 321 F.2d 162, 165 (5th Cir. 1963) ("[A] party may not attack the credibility of its own witness (e.g., by impeachment.")).

The Government asserts NE Methodist violated the standard of care through the actions of three physicians who treated Ms. Busch there. The district court, after noting that Federal Rule of Evidence 607 abrogated the common law vouching rule, concluded that the Government nevertheless "vouched" for the three treating physicians by failing to impeach their testimony after each one testified that he or she had met the applicable standard of care. The district court concluded, "In the absence of any impeachment testimony from these third-party doctors who are themselves allegedly responsible for the wrongdoing, the government has vouched for its physicians/witnesses who testified in Court that they did not breach the standard of care."

The district court further found that the testimony of the third-party witnesses supported the conclusion that these medical providers did not breach the standard of care by failing to tell Ms. Busch that her X-ray revealed a "retained foreign body." The district court indirectly reasoned that to the extent any doctors suspected a foreign body could be present, they reasonably would not have suspected it was cancer, but rather a foreign body retained from the specific injury which brought her to the hospital—a retained foreign body somehow related to the pipe which fell on her foot.[6] Unlike BAMC, which confronted Ms.

---

[6] The district court identified testimony that supported its reasoning: Dr. Lopez checked the "inapplicable" box for foreign body because "there was no open wound, no [indication] of any type of penetrating injury." Dr. Lopez testified that he ordered an X-ray but did not see a retained foreign body. Dr. Stolle, a radiologist examining Ms. Busch, found "soft tissue swelling with possible retained foreign body," which he thought could be "a little piece of plastic or wood from a penetrating injury." And on cross, Dr. Stolle testified that Ms. Busch's injury by pipe did not rule out a penetrating injury. Dr. Scribbick explained that she wrote, "foreign body?" to indicate that an examination of Ms. Busch's left foot revealed no penetrating injury or open wound which would indicate that a retained foreign body could possibly be present.

No. 10–50845

Busch's pain with the knowledge that it had inexplicably persisted for over five months, NE Methodist treated Ms. Busch on the basis of her narrow complaint of a workplace injury and without knowledge of BAMC's earlier treatment and recommendations.

The district court therefore found that the evidence supported the conclusion that NE Methodist physicians did not breach the standard of care in failing to tell Ms. Busch that her X-ray revealed a retained foreign body. Having found that the Government failed to prove an essential element of its claim against the third-party physicians, the district court concluded that the Government did not show negligence on the part of the medical providers it brought in court to testify—and thus no negligence on NE Methodist's part.

Although the Government stresses that NE Methodist shares responsibility for the failure to detect Ms. Busch's cancer because the Plaintiffs' and Government's medical experts agreed that NE Methodist was at least partially responsible, it fails to overcome the district court's essential conclusion: that the Government did not meet its burden in establishing that NE Methodist was negligent. As the Plaintiffs note, the evidence at trial conflicted over whether third-party doctors breached the standard of care and, further, no evidence showed that any potential breach by the third-party physicians caused Ms. Busch's death. Rather, as Plaintiffs assert, the evidence at trial showed it was unlikely Ms. Busch would have survived had the cancer been detected when NE Methodist physicians examined her in September 1997. Plaintiffs' and Government's experts agreed that the window of opportunity for a cure was between January 1997 and September 1997.

Given the persuasive testimony of the NE Methodist physicians in the absence of little other compelling evidence, we agree with the Plaintiffs that the district court did not clearly err in finding that NE Methodist was not liable for Ms. Busch's injuries. The Government's failure to produce convincing expert

10

No. 10–50845

testimony as to NE Methodist's negligence, taken with the different contexts in which doctors at BAMC and NE Methodist treated Ms. Busch's left foot, supports the district court's holding. The district court's discussion of the vouching rule, while improper, does not taint its basic conclusion that the Government did not meet its burden. The district court credited the testimony of the NE Methodist witnesses the Government called over any other evidence suggesting NE Methodist's liability. There is no clear error.

## B

The Government also disputes the district court's conclusion that Ms. Busch was not comparatively negligent because she acted as a reasonable and prudent person with her training and experience would have acted in the same or similar circumstances. We hold that the district court did not err in concluding that Ms. Busch was not comparatively negligent.

Under Texas law, comparative responsibility expressly applies to negligence claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.003(a) (directing trier of fact to calculate percentage of responsibility of the claimant in a negligence case). Applying comparative responsibility, the trier of fact must reduce a plaintiff's recovery in tort by the proportion she contributed to causing her own harm through actions that were negligent or otherwise fell below some legal standard. TEX. CIV. PRAC. & REM. CODE ANN. § 33.012(a); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 593 (Tex. 1999). "[A] claimant may not recover damages if his percentage of responsibility is greater than 50 percent." TEX. CIV. PRAC. & REM. CODE ANN. § 33.001.

A plaintiff's comparative negligence arises from her breach of a legal duty in tort, the breach of which proximately causes damages. *Columbia Med. Ctr. of Las Colinas, Inc v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008). Patients owe their treating physicians a duty of cooperation. *Jackson v. Axelrad*, 221 S.W.3d

No. 10–50845

650, 654 (Tex. 2007). Where a patient fails in this duty, the trier of fact may find comparative negligence. *Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex. 1992).

The duty to cooperate encompasses cooperation in treatment and diagnosis. *Axelrad*, 221 S.W.3d at 654. "Given the infinite variety of patients, diseases, and circumstances surrounding medical care," the Texas Supreme Court has declined to prescribe "an exhaustive list defining a patient's duty to cooperate." *Id.* at 655. But the Texas court has made clear that in most cases, "an ordinary patient's failure to report the origin of pain will be no evidence of negligence." *Id.*

Because Ms. Busch had very limited EMT training, the district court held her to the standard of a reasonably prudent person with the same EMT training and experience in the same or similar circumstances.[7] Applying this standard, the district court found that Ms. Busch fulfilled her duty to cooperate by: (1) following BAMC's instructions in her August 2006 visit; (2) returning to BAMC in January 1997 when the swelling and pain did not subside; (3) obtaining a bone scan at BAMC's direction; and (4) unsuccessfully seeking an appointment for an orthopedic consultation at BAMC's instruction.

The district court emphasized the testimony of the Government's expert, Dr. Netaji, who impliedly agreed with Plaintiffs' experts that doctors could and should have diagnosed the cancer in Ms. Busch's foot in January 1997 when presented with a six-month history of swelling and pain. When a physician's assistant at BAMC examined Ms. Busch on January 8, 1997, he recognized a potential problem in Ms. Busch's left foot and took action by requesting X-rays, followed by a bone scan. After those tests ruled out the possibility of a stress fracture or other damage to bony tissue, the physician's assistant instructed Ms.

---

[7] The evidence shows that Ms. Busch completed a basic EMT training course and that her EMT-related  experience was limited to volunteering at the Kirby Fire Department and a two-and-a-half week stint working at Med Star.

No. 10–50845

Busch to secure an appointment for an orthopedic consultation and recommended Motrin for any discomfort. Ms. Busch fully complied with these recommendations, but BAMC told her she would be placed on a waiting list and would be called to schedule an appointment for the orthopedic consult. In the meantime, the district court noted, Ms. Busch divorced and lost access to her husband's military benefits.

The district court underscored, and the record confirms, that no one informed Ms. Busch about the possibility of a tumor during her visits to BAMC in August 1996 and January 1997. A physician's assistant ordered an orthopedic consultation but no one told Ms. Busch that it was critical. Regardless, Ms. Busch sought an immediate orthopedic appointment, but BAMC placed her on a waiting list.

Further, the district court noted that after Ms. Busch consulted with BAMC three or four times over a six-month period (the record reflects that the district court uses the term "consulted" expansively to include Ms. Busch's phone calls in which she attempted to make an appointment), BAMC repeatedly told her that her injury was only a contusion. When Ms. Busch sought medical treatment at NE Methodist in September 1997 after her new work-related injury, Ms. Busch was again told her injury was only a contusion. This repeated diagnosis led Ms. Busch to believe it was futile to attempt to discuss her foot pain with other doctors from whom she sought medical care.

The district court ultimately found that based on common sense and Ms. Busch's limited training and experience from EMT classes, BAMC's acts and omissions were the substantial factor that caused her ultimate harm; they influenced and affected all her later actions with respect to treatment. The district court found that without the specialized medical training and knowledge described in *Axelrad*, Ms. Busch had the duty to cooperate in the diagnosis, but

13

No. 10–50845

no duty to diagnose herself—and that Ms. Busch was thus entitled to rely on BAMC's diagnosis of a contusion.

The Government pins Ms. Busch's comparative negligence on her failure to pursue medical assistance after BAMC and NE Methodist physicians told her to seek additional care. The Government emphasizes that Ms. Busch failed to obtain an orthopedic consultation after a BAMC physician's assistant told her to do so in January 1997. The Government explains that the BAMC employee warned Ms. Busch that because active-duty soldiers at Fort Sam Houston received priority over army dependents, she should follow up and obtain an orthopedic referral if she did not hear from BAMC within three to four days. The Government stresses that Ms. Busch did not follow up. The Government similarly underscores that Ms. Busch failed to follow up on appointments at NE Methodist eight months later to seek recommended consultations. Had Ms. Busch made follow-up appointments as advised, Dr. Scribbick explained, "a prudent family doctor would have been more aggressive in terms of finding—you know, finding what was going on." But Ms. Busch did not make any follow-up appointments; she also failed to return to NE Methodist's ER, as Dr. Scribbick prescribed.[8]

---

[8] Further, the Government notes that during the period between Ms. Busch's last visit to BAMC in January 1997 and her diagnosis with foot cancer in January 1999, Ms. Busch visited doctors twenty-three times for different reasons but did not ask for assistance with her continuing foot pain. The Government contends that these failures to seek a diagnosis compel the conclusion that there was contributory negligence.

The Government lastly reiterates the testimony of the experts on Ms. Busch's relative fault: The Government's orthopedic expert assessed Ms. Busch's responsibility for the missed diagnosis at fifty percent; Plaintiffs' oncologist deemed Ms. Busch twenty percent responsible; Plaintiffs' family-practice expert surmised two to four percent responsibility. In light of this testimony, the Government asserts that the district court's determination of zero responsibility for Ms. Busch is both legally and factually incorrect and unsustainable. The Government maintains that the district court should have held Ms. Busch at least partially responsible for the delay in detecting and treating her condition. Because we hold that the district court did not err in concluding that Ms. Busch acted as a reasonably prudent person and thus was not at comparatively negligent, we need not reach these arguments.

14

No. 10–50845

Plaintiffs respond that the district court properly found that Ms. Busch acted as a reasonably prudent patient with the same training and experience would have in similar circumstances:  she complied with healthcare providers' instructions and repeatedly sought treatment for swelling to her left foot, but was always told it was merely a contusion.    Plaintiffs assert that the uncontroverted evidence shows that Ms. Busch immediately sought an orthopedic consultation but the Government placed Ms. Busch on a waiting list and then failed to make the appointment as required by their own policy and never contacted Ms. Busch regarding an appointment.  Plaintiffs also maintain that the uncontroverted evidence shows that after treatment at NE Methodist on September 5, 1997, Ms. Busch returned for follow-up treatment on September 8, 1997, and called the hospital on September 15, 1997, as follow-up—a reasonable course of action in light of her diagnosis of a contusion.[9]

---

[9] Plaintiffs identify the following evidence as supporting the conclusion that Ms. Busch acted as a reasonable patient with her training and experience in the circumstances of this case: (1)  In August 1996, she sought treatment at BAMC for an injury to her left foot; (2)  When swelling persisted, Ms. Busch returned to BAMC on January 8, 1997, for examination and treatment of her left foot; (3)  On January 8, 1997, Ms. Busch informed BAMC healthcare providers that she had injured her left foot approximately six months earlier,  X-rays taken at that time were negative for a fracture, and she experienced chronic swelling, but no new injury to that foot; (4)  On January 8, 1997, Ms. Busch complied with BAMC's instructions to obtain an X-ray of her left foot; (5)  On January 9, 1997, Ms. Busch complied with BAMC's instructions given on January 8, 1997, to obtain a bone scan of her left foot, and complied with BAMC's instructions regarding the orthopedic consultation by attempting to schedule an appointment, but was told there were no available appointments and she was placed on a waiting list; (6)  Ms. Busch reasonably relied on the representations by the Government's agents and employees in January 1997 that she would be contacted regarding the orthopedic consultation; (7)  Ms. Busch reasonably relied on BAMC's diagnosis that she had sustained a contusion and the injury was not serious; (8)  On September 5, 1997, Ms. Busch injured her left foot at work and Dr. Lopez examined and treated her at NE Methodist's ER, after which Ms. Busch complied with Dr. Lopez's precise instructions and kept her foot elevated and iced; (9)  The only diagnosis that Dr. Lopez gave to Ms. Busch was that she had sustained a contusion, "essentially a bruise to the foot"; Ms. Busch reasonably relied on this diagnosis which was similar to BAMC's previous diagnosis; (10)  Dr. Lopez testified that Ms. Busch could return to the ER for follow-up, and the healthcare providers at NE Methodist told her to return to the ER if she continued to have problems, and so, on September 8, 1997, Ms. Busch returned to the NE Methodist ER for follow-up regarding the work-related injury to her

15

No. 10–50845

The district court did not clearly err in finding that Ms. Busch acted as a reasonably prudent person with her training in the circumstances she faced. We further hold that the district court did not err in concluding that Ms. Busch was not comparatively negligent. BAMC's own failure to follow up with Ms. Busch thwarted Ms. Busch's efforts to pursue further treatment. The fact that doctors repeatedly diagnosed her with contusions supports the inference that Ms. Busch did not view the doctors' requests with the same urgency as she would have had they even hinted at the possibility of something more serious. Further, testimony showed that she was cooperative and willing to take doctor's advice. And, more fundamentally, the district court's characterization of Ms. Busch's failure to fully pursue treatment appeals to common sense. Nothing in the record shows that Ms. Busch was advised of the possibility of cancer or that the failure to pursue further treatment could cause her death. Rather, throughout this period, all medical service providers consistently diagnosed Ms. Busch with a mere contusion.

## III

Plaintiffs contend on appeal that the district court erred by excluding damages for household services from their economic damages award, thus limiting Plaintiffs' recovery for household services to a $250,000 cap on noneconomic damages. The district court applied the cap because the Plaintiffs

---

foot because the pain, swelling and redness did not go away; Dr. Lopez conceded that Ms. Busch's return to the NE Methodist ER was her way of following up; (11) When Ms. Busch returned to NE Methodist on September 8, 1997, Dr. Scribbick's diagnosis was "contusion and left foot cellulitis, meaning a left foot skin infection"; it was reasonable for Ms. Busch to rely on this diagnosis which, except for the skin infection diagnosis, was similar to the previous diagnosis she had been given by other healthcare providers at BAMC and NE Methodist; and (12) Dr. Scribbick testified that on September 8, 1997, she instructed Ms. Busch not to work for seventy-two hours, keep the foot elevated, and return for fever and increased redness; Ms. Busch complied with Dr. Scribbick's instructions, and as a result, the redness subsided and the swelling diminished so that Ms. Busch believed the problem resolved.

No. 10–50845

failed to show actual monetary losses from Ms. Busch's lost household services. We hold that the district court committed legal error.

As of 2003, the Texas Medical Liability Act ("TMLA") imposes a limitation of $250,000 on a claimant's noneconomic damages:

> In an action on a health care liability claim where final judgment is rendered against a single health care institution, the limit of civil liability for noneconomic damages inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b). The TMLA incorporates the definitions of "economic damages" and "nonecomomic damages" provided in Chapter 41 of the Texas Civil Practices and Remedies Code. *Id.* § 74.001(6), (20).

"Economic damages" are "compensatory damages intended to compensate a claimant for actual economic or pecuniary loss" but not "exemplary damages or noneconomic damages." *Id.* § 41.001(4). In wrongful death cases, "[p]ecuniary loss . . . is not subject to precise mathematical calculation." *Christus Health v. Dorriety*, 345 S.W.3d 104, 113 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). A plaintiff may recover pecuniary losses "even in the absence of specific evidence of the amount of contributions being made by the deceased before her death or that she would have continued to contribute in the future." *Id.* Factfinders maintain "significant discretion in determining this element of damages" and "may look beyond evidence of calculable financial contributions." *Id.*

In contrast, "noneconomic damages" are "damages awarded for the purpose of compensating a claimant for physical pain and suffering, mental or emotional pain or anguish, loss of consortium, disfigurement, physical impairment, loss of companionship and society, inconvenience, loss of enjoyment

17

No. 10–50845

of life, injury to reputation, and all other nonpecuniary losses of any kind other than exemplary damages." TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(12).

Historically, the term "household services" has encompassed domestic duties, *Dougherty v. Gifford*, 826 S.W.2d 668, 681 (Tex. App.–Texarkana 1992, no writ), for which no dollar amount must be proven. *EDCO Prod., Inc. v. Hernandez*, 794 S.W.2d 69, 77 (Tex. App.—San Antonio 1990, writ denied). Household services have been treated as distinct from intangible or emotional damages recoverable in a loss of consortium claim. *Whittlesey v. Miller*, 572 S.W.2d 665, 666 n.2 (Tex. 1978). *But see U-Haul Intern. v. Waldrip*, 322 S.W.3d 821, 856 (Tex. App.—Dallas 2010, pet. granted Dec. 16, 2011) (listing "services" among emotional and intangible damages encompassed by loss of consortium).

After the passage of the TMLA's cap, at least one Texas court has treated household services as a pecuniary loss, not subject to the limit on noneconomic damages. *See Dorriety*, 345 S.W.3d at 111–13. In *Dorriety*, a Texas appellate court held that plaintiffs could recover household services, a pecuniary loss, based on their expert's testimony that calculated the value of the loss of their family member's household services by looking to national surveys, in light of the family member's age and the age of her son. *Id.* at 112. The court then awarded the plaintiffs damages for household services in excess of TMLA's cap. *Id.* at 112–13. Whether household services were an economic or noneconomic damage was not considered or in dispute; all parties and the court proceeded under the assumption that household services are a pecuniary loss; the court focused its inquiry on whether proof for this pecuniary loss had been shown. *See id.* at 111–13.

The district court here treated Plaintiffs' claimed household services damages as a noneconomic loss because it found that they had not presented evidence of actual costs incurred from the loss of Ms. Busch's services. At the same time, the district court held that Plaintiffs' household services were

18

No. 10–50845

inextricable from their loss of society and companionship. In awarding the maximum amount for noneconomic damages, it is unclear whether Plaintiffs' claim for household services separately formed any part of the award or if the noneconomic damages award was in fact entirely based on Plaintiffs' loss of society and companionship.[10] The district court erred, but the impact of that error is unclear.

To explain: The Plaintiffs assert that the district court's ruling is inconsistent with the historical treatment of household services in Texas as an economic damage. We agree. Our review of the law leaves us convinced that household services are a pecuniary loss, the loss of which, particularly in a wrongful death case like this one, need not be shown with mathematical precision. *See, e.g.*, *Dorriety*, 345 S.W.3d at 113.

Plaintiffs also dispute that there was a lack of evidence as to the dollar amount in this case. The Plaintiffs explain that Dr. Smith, the Government's expert, testified that the present value of the loss for replacement of household/family housekeeping and household management services as a result of the reduction of Ms. Busch's ability to physically perform household services from 1999 through 2004 is $33,946 with future losses of $297,857. Dr. Smith addressed the loss of household services as work performed that has an economic benefit to the household, not as a part of the loss of love and affection, concluding

---

[10] The district court that decided the issue now on appeal previously addressed whether household services are economic or noneconomic damages in *Tello v. United States*, 608 F. Supp. 2d 805 (W.D. Tex. 2009) (Biery, J.). In *Tello*, the plaintiffs sought to recover damages for the loss of their wife and mother's services, which included cooking, cleaning, laundering, and child care. *Id.* at 807. The district court characterized these services as "manifestations of love and affection," the loss of which could be considered in determining damages. *Id.* at 809. But the district court found "no evidence [that] the loss of these services necessarily resulted in direct financial loss to the survivors" and therefore found that they did not fall within the scope of "economic" damages. *Id.* Neither *Tello* nor the district court's analysis below, however, properly encapsulates Texas law. *See, e.g.*, *Dorriety*, 345 S.W.3d at 113.

No. 10–50845

that the total economic loss of "household/family housekeeping and household management services" was $313,803. And Dr. Swiger, Plaintiffs' expert, testified that the present value of economic loss of household services that Plaintiffs suffered as a result of Ms. Busch's illness was $12,224 up to her death with future losses of $588,760.

The Government, on the other hand, maintains that no testimony showed that Ms. Busch's family ever hired anyone to replace her, either during the illness or after her death on October 10, 2005. In the economic analysis prepared by Plaintiffs' expert Dr. Swiger, the calculations for lost household contributions through that date were based not on any replacement help either actually anticipated or actually hired, but on "substantial reductions in the amount of household contributions that she was able to make," which were "estimated" as "amount[ing] to 30 hours per week" based on "an average replacement cost of $7 per hour."

The district court's analysis rested on the assumption that to recover the loss of household services as an economic damage, the Plaintiffs had to show with mathematical precision the amount of monetary loss they suffered as the result of Ms. Busch's death. This, however, contradicts Texas law that, even after the passage of TMLA's damages cap, treats household services as a pecuniary loss and, moreover, does not require plaintiffs in a wrongful death case to show with mathematical precision the amount of their pecuniary loss. *See, e.g.*, *Dorriety*, 345 S.W.3d at 113. The district court's finding of no evidence as to household services rested on an erroneous interpretation of the law. The expert testimony and evidence presented at trial may be sufficient to make a finding of pecuniary loss. That is a question the district court must consider on remand.

No. 10–50845

**IV**

For the reasons above, we AFFIRM the district court's judgment in part and REVERSE and REMAND in part for further consideration of the evidence in light of our opinion today. We hold that the district court did not err in finding the Government fully liable for the damages award because the Government did not present adequate evidence of NE Methodist's liability. The district court also did not err in concluding that Ms. Busch was not comparatively negligent because the evidence shows that Ms. Busch acted as a reasonable prudent person of her same training and experience would have acted in similar circumstances. But the district court did err in its assessment of Plaintiffs' claim for household services.