# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 13, 2012

No. 12-40057

Lyle W. Cayce
Clerk

MAURICE SMITH, As personal representative of the estate of Austin F. Smith; MAURICE SMITH, Individually; PERRY SMITH; STAN SMITH,

Plaintiffs-Appellants

v.

CHRISTUS SAINT MICHAELS HEALTH SYSTEM,

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:10-CV-34

Before REAVLEY, DENNIS, and CLEMENT, Circuit Judges.

PER CURIAM:[*]

Plaintiffs-Appellants in this healthcare liability case appeal from the district court's grant of summary judgment in favor of Defendant-Appellee Christus St. Michaels Health System ("Christus" or "hospital") in their suit alleging the wrongful death of Austin F. Smith. The primary issue on appeal is whether Plaintiffs provided evidence that Christus's negligence was the proximate cause of Smith's death. As explained below, we hold that the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-40057

Plaintiffs' evidence was sufficient to create an issue of fact on the causation question, and we therefore REVERSE the district court's judgment.

## I.

Austin Smith was a 71-year old man suffering from recurrent colorectal cancer. Smith was also diagnosed with a rare blood disorder, known as thrombotic thrombocytopenic purpura ("TTP"), for which he was admitted to Christus for treatment in November 2008. In order to treat the TTP, Smith's doctors implanted a Quinton catheter in his right internal jugular vein. During his hospitalization, Smith was also given pain medication and sedatives.

Viewed in the light most favorable to Plaintiffs, the record shows that Smith was a patient with a high risk for falls due to his age, medication, and physical condition. The hospital's protocols for handling such high-risk patients required, among other things, that a bed alarm be activated. Once activated, the alarm makes a beeping noise if the patient gets out of bed, which alerts the nurse to check on the patient.

On the night of November 24, 2008, Smith was given a sedative to help him sleep. His bed alarm was not activated. At approximately 1:20 a.m. hospital staff also gave Smith a laxative because he had been suffering from constipation. It is unclear from the evidence whether the laxative, which can act quickly and cause cramping, was supposed to be administered earlier. In any event, the nursing notes at that time indicated that the staff would monitor Smith. No monitoring took place, however, for over three hours. At approximately 4:40 a.m., nurses discovered Smith lying in a pool of blood on his bathroom floor with his pants pulled down. The Quinton catheter, which had been in Smith's neck, had been removed and was found on the table at the foot of Smith's bed. At 4:55 a.m. Smith was pronounced dead, having bled to death from the hole in his neck where the catheter had been.

No. 12-40057

Smith's wife, individually and as representative of his estate, as well as his two sons, filed the instant wrongful death suit against Christus, alleging that Christus was negligent by, *inter alia*, failing to follow the proper standard of care for patients with a high risk of falls.  Specifically, Plaintiffs alleged that the nursing staff was negligent in failing to activate Smith's bed alarm and in failing to monitor Smith more frequently.

Plaintiffs relied in part on the opinion of their expert, Dr. Brian Camazine, who testified that the most logical explanation for the sequence of events leading to Smith's death was that Smith, either accidentally or in a state of confusion, removed his own catheter when he got out of bed sometime after 1:20 a.m.  Dr. Camazine opined that if "Smith's bed alarm had been activated, as per hospital protocol, then the nursing staff would have been alerted and responded by going to Mr. Smith's room.  It would have been a simple procedure to stop the bleeding from the Quinton catheter site and Mr. Smith would certainly have survived."  Dr. Camazine also opined that if Smith "had been monitored more frequently, then, again, his bleeding would have been observed and corrected and it is unlikely that he would have expired."

The parties proceeded by consent before the magistrate judge.  Christus moved for summary judgment, arguing that Plaintiffs failed to produce sufficient evidence of causation on their negligence claim.  Christus argued that because Plaintiffs failed to show that Smith would have survived his underlying cancer and TTP, they could not, as a matter of law, show that the alleged negligence of the nursing staff was a proximate cause of Smith's injuries and death.  The magistrate judge agreed with Christus and granted summary judgment.  Plaintiffs now appeal.

## II.

We review a grant of summary judgment *de novo*, applying the same standards as the district court.  *Poole v. City of Shreveport*, 691 F.3d 624, 627

No. 12-40057

(5th Cir. 2012). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view all evidence in the light most favorable to the non-movant. *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012).

When the district court exercises diversity jurisdiction over a dispute, we apply the substantive law of the forum state, which in this case is Texas. *See Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010). In a medical malpractice case in Texas, plaintiffs are required to present evidence establishing a "reasonable medical probability" or a "reasonable probability" that their injuries were caused by the defendants, "meaning simply that it is more likely than not that the ultimate harm or condition resulted from such negligence." *Jelinek v. Casas*, 328 S.W.3d 526, 532–33 (Tex. 2010) (internal quotation marks and citation omitted). The more-likely-than-not requirement means that there is "a more than 50% probability that a defendant's wrongful conduct caused the harm or injury." *Young v. Mem'l Hermann Hosp. Sys.*, 573 F.3d 233, 235 (5th Cir. 2009) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 715–17 (Tex. 1997)).

Causation has two components: cause-in-fact and foreseeability. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Cause-in-fact is shown when, "by a preponderance of the evidence, the negligent act or omission is shown to be a substantial factor in bringing about the harm and without which the harm would not have occurred." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399–400 (Tex. 1993); *see also Travis*, 830 S.W.2d at 98. "'Foreseeability' means that the actor, as a person of ordinary intelligence, should have anticipated the dangers that his negligent act created for others." *Travis*, 830 S.W.2d at 98. "In medical malpractice cases, expert testimony regarding causation is the norm." *Jelinek*, 328 S.W. 3d at 533; *see also Guevara v. Ferrer*, 247 S.W.3d 662, 665

4

(Tex. 2007) ("The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors.").

Plaintiffs here presented expert evidence on causation in the form of Dr. Camazine's opinion. The magistrate judge held, however, that summary judgment should be granted to Christus because of the "lost chance" doctrine, which can affect recovery in a medical malpractice case when the tort victim suffers from pre-existing conditions. Under this rule, "where preexisting illnesses or injuries have made a patient's chance of avoiding the ultimate harm improbable even before the allegedly negligent conduct occurs—*i.e.*, the patient would die or suffer impairment anyway—the application of these traditional causation principles will totally bar recovery, even if such negligence has deprived the patient of a chance of avoiding the harm." *Kramer*, 858 S.W.2d at 400. In *Kramer*, the Texas Supreme Court declined to recognize a separate, compensable cause of action for a mere reduction in a plaintiff's chance of surviving a pre-existing condition. *Id.* at 403–07.

In the instant case, Christus argues, and the magistrate judge held, that Plaintiffs cannot prevail because they did not present evidence that Smith had a greater than fifty percent chance of surviving his cancer or TTP. Under this reasoning, Plaintiffs cannot show, as a matter of law, that Christus's alleged negligence was a cause of Smith's death because Smith would have eventually died of cancer and/or TTP anyway. The lost chance doctrine is not applicable here because Christus's alleged negligence was unrelated to Smith's underlying condition and there was evidence that his death was caused by that negligence. The underlying condition could be material to Smith's life expectancy and to damages recoverable by Plaintiffs, but that does not bar recovery.

In the cases where the lost chance rule was relevant, there was a direct connection or association between the underlying pre-existing condition and the

No. 12-40057

defendants' negligence and resulting injury. For example, in *Kramer,* a patient was misdiagnosed as not having cancer, and there was conflicting evidence as to the likelihood that a proper diagnosis would have made a difference in preventing the patient's death from that condition. *Id.* at 399. The plaintiffs sought a jury instruction permitting damages for the diminution in the opportunity for successful care, whatever the percentage of loss might be, but the Texas Supreme Court held that there was no separate cause of action to recover merely for the lost chance of survival. *See id.* at 399, 403–07.

Similarly, in *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851 (Tex. 2009), another patient's cancer was misdiagnosed due to alleged negligence, and there was competing evidence as to the plaintiff's chance of avoiding her terminal condition had she received immediate treatment. The court held that the trial court should have instructed the jury that the plaintiff must have had a greater than fifty percent chance of surviving the cancer for the negligence to be a proximate cause of injury. *Id.* at 859–62. And in *Park Place Hosp. v. Milo*, 909 S.W.2d 508, 509 (Tex. 1995), the patient developed sepsis after surgery and had to be placed on a respirator. When the plaintiff was negligently removed from the respirator, he went into cardiac arrest, suffered brain damage, and died, but the evidence showed that the patient had only a forty-percent chance of surviving the sepsis even if he had remained on the respirator. *Id.* at 509–10. The Texas Supreme Court held that recovery was barred for the substandard care that merely reduced the patient's less than even chance of survival from the underlying condition. *Id.* at 511.

The Texas cases applying the lost chance doctrine are not analogous to the instant case. "[T]his is not a case in which the patient was already suffering from the injury or illness which ultimately led to her death." *Renaissance Healthcare Sys. v. Swan*, 343 S.W.3d 571, 588 (Tex. App.—Beaumont 2011, no pet.). Furthermore, there is no reason to believe that Smith's cancer or TTP

made Smith's chance of avoiding injury on the day he died improbable even before the defendants' negligence. *See Marvelli v. Alston*, 100 S.W.3d 460, 481 (Tex. App.—Fort Worth 2003, pet. denied) (distinguishing loss of chance cases because "no evidence was adduced at trial demonstrating that preexisting illnesses or injuries made [plaintiff's] chance of avoiding the ultimate harm improbable even before [defendant's] negligent conduct occurred"). Smith was not injured because his pre-existing condition was misdiagnosed or because he received substandard care for the condition that would have killed him anyway, and Plaintiffs are not seeking recovery for an alleged loss of chance to be cured from cancer. Smith died because he bled to death as a result of Christus's alleged negligent failure to provide a safe environment through the use of a bed alarm or more frequent monitoring. This alleged negligence had nothing to do with Smith's cancer or his chance of survival from cancer. Smith may have *eventually* died from cancer and/or TTP, but we do not believe that the Texas lost chance rule is applicable merely because a tort victim happens to have a terminal illness absent some relationship between that illness and the alleged malpractice that results in injury or death. If that were the case, medical practitioners would be immunized from any negligence in every instance where a patient has a more than even chance of dying, regardless of the degree or kind of negligence or how and when the patient dies.

Christus argues that the lost chance rule does apply because Christus's alleged negligence "directly relates to Mr. Smith's treatment for his preexisting medical conditions," *i.e.*, his colorectal cancer and TTP. We are unpersuaded. Although Smith was certainly in the hospital for treatment of his TTP, and the Quinton catheter was implanted for that purpose, the Plaintiffs' allegations simply do not implicate such treatment. The Plaintiffs do not allege that Smith died because of his doctors' or nurses' malfeasance in the specific care for TTP or cancer, or because of complications from the treatment of those conditions.

No. 12-40057

Nor do they allege that Christus failed to follow the proper standard of care applicable to *cancer or TTP* patients.  The Plaintiffs allege that Smith died because the Defendant failed to take proper safety measures that were applicable to *all* similarly-situated patients—*i.e.*, elderly, heavily sedated, and at a high risk for falls—and that would have allowed the hospital staff to respond when Smith unfortunately ended up out of bed, bleeding on the floor of his bathroom.  Smith's death was therefore allegedly related to negligent acts wholly apart from Smith's cancer and TTP treatment.

Christus argues in the alternative that, apart from the lost chance rule, we should affirm the summary judgment because Plaintiffs failed to establish the cause-in-fact and foreseeability elements of causation.  We may affirm a summary judgment on any ground raised below and supported by the record. *Ballard v. Devon Energy Prod. Co.*, 678 F.3d 360, 365 (5th Cir. 2012).  Christus argues that the causation opinion of Plaintiffs' expert, Dr. Camazine, was conclusory and unreliable.  In addressing this argument below, the magistrate judge focused on Dr. Camazine's failure to opine that Smith had a greater than fifty percent chance to survive his cancer or TTP, which as we explained above was not required.   The magistrate judge also concluded that Dr. Camazine's opinion that Smith would likely have survived the dislodged catheter was conclusory and unsupported by facts or studies.  Plaintiffs argue that the magistrate judge erred by disregarding Dr. Camazine's opinion.  We agree.

An expert must "'explain the how and why the negligence caused the injury'" rather than simply opine that causation is present.  *Ellis v. United States*, 673 F.3d 367, 373 (5th Cir. 2012) (quoting *Jelinek*, 328 S.W.3d at 536); *see also Marvelli*, 100 S.W.3d at 478 ("the expert must explain the basis of his statement to link his conclusions to the facts") (internal quotation marks and citation omitted).  Here, Dr. Camazine provided sufficient reasons for his opinion through his affidavits and deposition testimony.

Dr. Camazine explained that Smith was an elderly, debilitated patient, with a high risk for falls and a low platelet count, which made him a high risk for bleeding. Dr. Camazine testified that Smith's age and sedation also made Smith the type of patient that might become confused at night. He noted that, only hours before death, in addition to receiving a sleep aid, Smith had been given a laxative, which might make Smith not only have to get out of bed but also have to get out of bed in a hurry, thereby increasing his chances of a fall. In light of Smith's condition, a bed alarm and frequent monitoring of Smith were necessary, in Dr. Camazine's opinion.

According to Dr. Camazine, if the bed alarm had been activated, Smith likely would have been discovered by the nursing staff while still alive and his bleeding could have been stopped through simple procedures.[1] Dr. Camazine estimated that Smith could have been alive and bleeding for as long as thirty minutes. Christus argues that Dr. Camazine's opinion is unreliable because he did not opine to a reasonable medical probability on the exact length of time it would have taken Smith to bleed to death. But Dr. Camazine testified to his knowledge about Quinton catheters, having personally implanted them in patients, and he further testified that he has seen patients bleed from dislodged catheters but none ever bled out. In explaining why he believed the nurses would have had time to save Smith, Dr. Camazine compared the rate of bleeding to how long it takes a person to give blood through a large bore needle, and he

---

[1] The magistrate judge faulted Dr. Camazine for failing to consider the possibility that Smith could have bled to death after removing his own catheter without ever having left the bed, in which case a bed alarm would not have mattered. It is undisputed, however, that no blood was found in Smith's bed or anywhere else in the hospital room other than underneath Smith's body in the bathroom. Because the known facts do not support the possibility that Smith might have died in his bed, we see no reason to discount Dr. Camazine's opinion for not considering that scenario. *See Ellis*, 673 F.3d at 373 ("'The expert must explain why the inferences drawn are medically preferable to competing inferences *that are equally consistent with the known facts*.'" (emphasis added) (quoting *Jelinek*, 328 S.W.3d at 536)).

explained that the process takes some time. Although Dr. Camazine did not say precisely how long it would have taken Smith to bleed to death, he explained that it "would certainly take minutes" and not, for example, "60 seconds." Therefore, Dr. Camazine opined that even a nurse engaged in some other chore would have been able to respond to an activated bed alarm and administer care to Smith because death would not have been instantaneous.

Dr. Camazine was required to show that Christus's negligence "caused, at least in part," Smith's injuries to a reasonable degree of medical probability. *Ellis*, 673 F.3d at 373. We conclude that Dr. Camazine satisfied this standard and sufficiently explained how and why the alleged negligence more likely than not resulted in Smith's death. *See id.* The evidence was therefore sufficient for Plaintiffs to avoid summary judgment on the cause-in-fact element of causation.

With respect to foreseeability, Christus argues that Plaintiffs presented no evidence that a nurse or other healthcare professional could have reasonably anticipated that a failure to activate the bed alarm or monitor Smith would result in Smith removing his own catheter and bleeding to death. Foreseeability, however, "does not require that a person anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence." *Travis*, 830 S.W.2d at 98; *see Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996) ("Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable."). The danger that Defendant had to foresee was that a failure to activate Smith's bed alarm or to monitor him would create a risk that Smith could get out of bed and be injured. The evidence here showed that Smith, an elderly, weak patient with a high risk for falls and susceptibility to bleeding, was sedated yet given a laxative that could make him have to get out of bed in a hurry. Evidence in the record also suggested that Smith could become confused. The medical chart specifically noted that the nurses were to monitor Smith.

No. 12-40057

Under these circumstances, a person of ordinary intelligence could have reasonably foreseen a danger to Smith if left unmonitored or without a bed alarm. *See Travis*, 830 S.W.2d at 98. We therefore conclude that summary judgment may not be affirmed on the alternative basis that Plaintiffs failed to present evidence on the elements of causation.[2]

### III.

We conclude that Plaintiffs were not required to show that Austin Smith had a greater than fifty percent chance of surviving his cancer and TTP in order to prove causation where Defendant's alleged negligence caused Smith to bleed to death and was unrelated to Smith's pre-existing conditions. We also conclude that Plaintiffs submitted sufficient evidence on the causation issue to survive the summary judgment motion. The district court's judgment is therefore reversed and the case is remanded for further proceedings.

REVERSED and REMANDED.

---

[2] Plaintiffs raise the additional argument that the magistrate judge erred by excluding the testimony of their nursing expert about the side effects of the medication administered to Smith. Nurses in Texas are not permitted to administer drugs without a doctor's order, *see generally Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 414–15 (Tex. App.—Fort Worth 2003, no pet.), and they may not testify about causation. *Group v. Vicento*, 164 S.W.3d 724, 729 (Tex. App.—Houston 2005, pet. denied). Furthermore, the nurse here admitted that she had no formal training in pharmacology or toxicology, and she could not recall ever administering the medication at issue to a patient. Finally, her testimony showed that she considered herself an expert on side effects only because she had resources available to her from which she could look up the effects of medication. Under these circumstances, the magistrate judge did not abuse her discretion in concluding that the nurse was not qualified to testify about the side effects of the drug. *See Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence.").