# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 20, 2013

No. 12-51249
Summary Calendar

Lyle W. Cayce
Clerk

DOUG KELLERMANN,

Plaintiff-Appellant

v.

AVAYA, INC.,

Defendant-Appellee

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:11-CV-359

Before KING, CLEMENT, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Doug Kellermann filed suit against Avaya, Inc., alleging that Avaya breached the terms of its commission policy by manipulating its revenue recognition procedure, increasing Kellermann's target quota, and reducing his commission payment. Avaya moved for summary judgment on the basis that Kellermann could not prevail on his breach of contract claim because the policy at issue expressly authorized Avaya to adjust sales quotas and incentive

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-51249

payments at its discretion.  The district court granted Avaya's motion, and Kellermann now appeals.  For the reasons that follow, we AFFIRM the district court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Doug Kellermann worked for Avaya, Inc., as a global account manager. His compensation was governed by Avaya's "Global Sales Compensation Policies" ("Policies") and included a base salary and certain incentive payments. Incentive payments were based on the attainment of certain quotas, or monetary sales goals, that were established by the company for each salesperson during each plan period.  Plan periods were either twelve months (from October 1 through September 30) or six months in length (October 1 through March 31, and April 1 through September 30).[1]  A given sale was credited toward a salesperson's quota after revenue from that sale was recognized by Avaya, and incentive payments based on quota attainment were calculated and paid on a monthly or quarterly basis.

To receive incentive payments, a salesperson was required to have a signed, up-to-date condition sheet on file.  Effective October 1, 2009, Avaya developed its condition sheet for the first half of fiscal year 2010 (the "October condition sheet"), which Kellermann accepted on December 3, 2009. The October condition sheet included a section stating that the undersigned employee acknowledged the applicability of the Policies to the employee's compensation plan.  At all times relevant to this action, the Policies included the following notice, in bold lettering, on the cover page:

> AVAYA INC. ("AVAYA") HAS THE RIGHT TO AMEND, CHANGE, OR CANCEL THE SALES COMPENSATION POLICIES SOLELY AT ITS DISCRETION AND WITHOUT PRIOR NOTICE, EXCEPT IN COUNTRIES WHERE IT IS A VIOLATION OF APPLICABLE LAW.

---

[1] Kellermann alleges that six-month periods were atypical.

2

No. 12-51249

Elsewhere, the Policies included the following provision:

> Quota adjustments may be necessary after the start of the plan year (e.g., error correction, redefinition of quota, assignments, crediting changes, etc.).  Sales management (with the appropriate approvals) has the discretion to change quota, should there be an error in quota setting, assignments, crediting, or to ensure credit to those associates involved in a sale.

Finally, the Policies contained a similar provision near the end of the document, which stated:

> Avaya reserves the right to: (1) amend, change, or cancel the Sales Compensation Plan or Policies or any elements of the Plan solely at its discretion; and (2) revise assigned territories, revenue quotas, reduce, modify, or withhold compensation based on individual/team performance or Avaya determination of special circumstances, with or without prior notice, and either retroactively or prospectively, except in countries where it is a violation of applicable law.

The dispute currently at issue arose in connection with Kellermann's involvement in Avaya's successful effort to obtain a client's Internet Protocol/Automated Call Distributor ("IP/ACD") business.  Kellermann was instrumental in securing the IP/ACD project, which was scheduled to be implemented in four phases.  According to Kellermann, everyone within Avaya expected revenue for the first phase of the project ("IP/ACD I") to be recognized during the last quarter of fiscal year 2009.  Nevertheless, although IP/ACD I revenue allegedly was received during fiscal year 2009, and although IP/ACD I was fully installed and operational prior to October 1, 2009, Avaya did not recognize the related revenue until the first quarter of fiscal year 2010.[2]  As a result, Kellermann did not meet his sales quota for fiscal year 2009, and he did not receive a commission for IP/ACD I in fiscal year 2009.

---

[2] Avaya maintains that it recognized revenue as soon as reasonably practicable, consistent with accepted accounting practices, and notwithstanding any potential compensation ramifications of doing so.

No. 12-51249

On October 1, 2009, Avaya's salespersons began working under the sales quotas set forth in the October condition sheet. According to Kellermann, his quota was raised to include recognition of IP/ACD I revenue that he previously had anticipated would be recognized in fiscal year 2009. However, because Avaya's sales team initially did not anticipate that phase two of the project ("IP/ACD II") would begin until after March 31, 2010, Kellermann's quota in the October condition sheet did not include any IP/ACD II revenue.

Kellermann was paid his commission on IP/ACD I in January 2010. That same month, Avaya's client indicated that it wished to accelerate by several months completion of IP/ACD II. As that phase of the project was moving forward, on March 1, 2010, Avaya approved for Kellermann a new condition sheet for the period October 1, 2009 through March 31, 2010. Included therein was an increased sales quota. According to Avaya's sales operations manager, the company decided to issue new condition sheets to its sales personnel as a result of its December 2009 acquisition of Nortel Network's enterprise solutions business. As part of that acquisition, Avaya's salespersons, including Kellermann, were expected to sell legacy Nortel products as well as Avaya's products and services. The new condition sheets reflected those additional sales responsibilities, and in Kellermann's case, also increased his quota to account for the earlier-than-anticipated revenue from the IP/ACD project.

Kellermann rejected the new condition sheet on March 7, 2010, and submitted a letter of resignation the same day. IP/ACD II became operational in late March 2010, though Avaya allegedly already had recognized the revenue from that phase of the project earlier that month. Thus, according to Kellermann, in contrast to the company's approach with respect to IP/ACD I, Avaya recognized IP/ACD II revenue prior to the phase's operational date.

Because Kellermann had rejected the new condition sheet, Avaya's position was that the October condition sheet remained in effect. Under its

4

terms, Kellermann had acknowledged—by the condition sheet's incorporation of the Policies—the potential that Avaya could apply a "Large Sale Adjustment" to his quota. As set forth in the Policies, a Large Sale Adjustment permitted Avaya to (1) increase a salesperson's quota by 85% of a large sale's revenue and give credit to the salesperson for 100% of the large sale, or (2) leave the quota unchanged, but give the salesperson credit for only 15% of the large sale.[3] Avaya contends that, because acceleration of the IP/ACD project caused estimates regarding the timing of the project's revenue stream to be inaccurate, Kellermann achieved a disproportionately high quota achievement, resulting from an artificially low quota. To compensate for the inaccurate estimates, Avaya applied the Large Sale Adjustment to Kellermann's sales, but did so only in connection with revenue received from the second phase of the IP/ACD project. Consequently, Kellermann was credited with only 15% of the IP/ACD II sales.

In August 2010, Kellermann filed suit, claiming that Avaya breached its contract with him by manipulating its recognition of IP/ACD revenue and by applying the Large Sale Adjustment to IP/ACD II revenue. Following discovery, Avaya moved for summary judgment, which the district court granted after holding that Kellermann could not establish a breach of contract because Avaya simply had exercised its discretionary contractual right to amend, change, or cancel its sales compensation policies. Kellermann now appeals, contending that the court erred in granting summary judgment in Avaya's favor.

---

[3] According to the Policies, a quota could be reviewed in anticipation of a potential Large Sale Adjustment for the following, non-exclusive, reasons: "deal margin, profitability, structure, and validation/correction against original quota." Sales were permitted to be reviewed when a particular sale exceeded a salesperson's annual quota by 25% and was not included in the original quota allocation, or when the quota otherwise was inaccurate. Avaya expressly "reserve[d] the right to apply the Large Sale Adjustment Policy to any sales associates tied to the sale."

## II. STANDARD OF REVIEW

We review a lower court's grant of summary judgment de novo. *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 836–37 (5th Cir. 2009). Although we view the evidence and any inferences therefrom in the light most favorable to the nonmoving party, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), summary judgment is appropriate where the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," FED. R. CIV. P. 56(a), (c)(1). "A factual dispute is 'genuine' if a reasonable trier of fact could return a verdict for the nonmoving party." *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008). "Where the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no genuine issue of material fact can exist." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

## III. DISCUSSION

Kellermann argues that summary judgment was improper because various factual issues remain open. In particular, he maintains that the following fact questions precluded summary judgment: (1) whether Avaya intentionally delayed revenue recognition in fiscal year 2009; (2) whether Avaya intentionally accelerated revenue recognition in fiscal year 2010; (3) whether Avaya made this acceleration to implicate the Large Deal Adjustment (which otherwise would have been inapplicable); (4) whether Avaya refused to pay a commission it knew had been earned by Kellermann; and (5) what damages were sustained by Kellermann. Avaya responds that its actions merely were the result of adjustments necessitated by unanticipated changes in revenue timing related to the IP/ACD project. In any event, Avaya contends that its rationale is immaterial because, by incorporating the Policies, the October condition sheet

No. 12-51249

reserved for Avaya unfettered discretion to alter or cancel its compensation policies.

## A.  Applicable Law

Under Texas law, "[t]he  elements of a breach of contract claim are: (1) the existence of a valid contract between plaintiff and defendant; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of the contract; and (4) the plaintiff's damage as a result of the breach." *In re Staley*, 320 S.W.3d 490, 499 (Tex. App.—Dallas 2010, no pet.).  "Whether a party has breached a contract is a question of law for the court, not a question of fact for the jury." *Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 808 (Tex. App.—Houston [14th Dist.] 1996, writ denied).  "The court determines what conduct is required by the parties, and, insofar as a dispute exists concerning the failure of a party to perform the contract, the court submits the disputed fact questions to the jury." *Id.*  In other words, "[w]hile the factual determination of what actions were taken is for the fact finder, whether those actions constitute a breach of contract is a question of law for the court." *In re Cano Petrol., Inc.*, 277 S.W.3d 470, 473 (Tex. App.—Amarillo 2009, orig. proceeding).

## B.  Analysis

In applying these principles to the case *sub judice*, we find controlling our holding in *Nichols*, 495 F.3d 185.  As here, the plaintiff in *Nichols* filed suit against his former employer for failing to pay certain outstanding commissions allegedly due under a compensation plan that provided for a base salary plus a commission incentive.  *Id.* at 186–87.  The dispute arose after the employer presented the employee with a new goal sheet and sales plan for fiscal year 2001 that reflected a lower commission rate, a higher quota, and different customer assignments than had been provided for in the employee's fiscal year 2000 plan. *Id.* at 187.  The employee refused to sign the new goal sheet and, for various reasons, claimed that the terms of the fiscal year 2000 goal sheet and sales plan

7

still applied into fiscal year 2001. *Id.* The employer moved in district court for summary judgment, which the court granted after concluding that, regardless of which year's goal sheet and sales plan applied, the employer's compensation plan unambiguously gave management the right and discretion to adjust the employee's compensation. *Id.* at 188.

On appeal, we likewise observed that, even assuming the fiscal year 2000 goal sheet and sales plan applied, the employer's compensation plan allowed the employer "to establish or adjust quotas and geographic/account assignments at any time," to "review any sales substantially in excess of annual quota or objective," and "to make final and binding decisions regarding the amount of compensation earned and paid to any [p]lan [p]articipant." *Id.* at 187. Thus, the employee's contract "include[d] the very terms giving [the employer] discretion to adjust [the employee's] commission, assignments, and final compensation." *Id.* at 189. We therefore affirmed the district court's judgment, concluding that the employee could not show that the employer breached the terms of the fiscal year 2000 compensation plan, because the employer merely had "exercis[ed] rights clearly reserved to it by the [p]lan's language." *Id.* at 191.

In subsequently applying *Nichols*, we explained that the case stands for the proposition "that where an employer exercises rights reserved in the contract[,] there can be no breach of contract." *Hennings, Jr. v. CDI Corp.*, 451 F. App'x 359, 367 (5th Cir. 2011) (unpublished) (per curiam) (citing *Nichols*, 495 F.3d at 188 ("plaintiff cannot prove employer breached contract when employer exercising rights reserved in contract's plain language")). Accordingly, the holding in *Nichols* clearly governs the outcome here. Under the Policies, Avaya reserved—at its sole discretion, and without having to provide prior notice—the right to amend, change, or even cancel its sales compensation policies or any elements thereof; to revise revenue quotas; and to reduce, modify, or withhold incentive compensation. In other words, regardless of when it recognized

revenue for any particular sale, Avaya reserved for itself sole discretion to adjust Kellermann's incentive pay.   Kellermann agreed to these terms when he accepted the October condition sheet.   As a result, Kellermann was unable to establish a breach of contract, as Avaya simply exercised rights reserved to it in the plain language of the Policies.   *See Nichols*, 495 F.3d at 191.   Because Kellermann failed to establish the existence of this element of his breach of contract claim, no genuine issue of material fact existed, and summary judgment in Avaya's favor therefore was proper.   *See Celotex Corp.*, 477 U.S. at 322–23.

## IV.  CONCLUSION

Accordingly, we AFFIRM the district court's judgment.