# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 5, 2025

Lyle W. Cayce
Clerk

_____

No. 24-10063

_____

ISS Aviation, Incorporated Wyoming; ISS Aviation, Incorporated Guyana,

*Plaintiffs—Appellants*,

*versus*

Bell Textron, Incorporated,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:22-CV-689

_____

Before Higginbotham, Willett, and Ho, *Circuit Judges*.

Per Curiam:[*]

ISS Aviation, Inc. Wyoming (ISS Wyoming) and ISS Aviation, Inc. Guyana (ISS Guyana) worked on behalf of Bell Textron, Inc., a helicopter manufacturer, to sell helicopters in certain South American countries. During their six-plus years as Bell's representatives, ISS Wyoming and ISS Guyana achieved no sales. However, they now seek commissions or

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-10063

restitution for sales that post-date their contract with and representation of Bell, based on their supposed groundwork for the eventual sales and Bell's alleged failure to "support" their sales efforts. The district court granted summary judgment to Bell and dismissed the ISS parties' breach-of-contract, breach-of-implied-duty-to-cooperate, and *quantum meruit* claims. We AFFIRM.

I

Bell Textron, Inc. manufactures and sells helicopters around the world. Bell sells its helicopters through three paths: (1) Foreign Military Sales, through which Bell sells the product to the United States government who then sells the product to the customer; (2) Direct Consumer Sales, in which the customer buys the product directly from Bell; and (3) Canadian Commercial Sales, through which the customer obtains quasi-private financing from Export Development Canada to purchase the product from Bell.

To achieve sales, Bell contracts with Independent Representatives for specified terms. These Representatives work under Independent Representative Agreements, which outline the duties of both Bell and the Representative in marketing and selling Bell products. Included among these duties, each Representative is assigned a defined region and is required to market only Bell products—and none of any competitor.

Via six separate agreements, ISS Guyana was Bell's Representative in French Guiana, Guyana, and Suriname from 2013 to September 30, 2019. As background, Lex Barker—eventual head of ISS Guyana—owned Bell helicopters and a hanger in Guyana and had previously sold preowned helicopters to the Guyanese government. Bell had not sold a helicopter in Guyana since 1981, so Bell and Barker met to discuss doing business as an Independent Representative. Barker formed ISS Guyana soon after and

entered into an Agreement in 2013, which was subsequently renewed multiple times for varying term lengths. In 2015, ISS Guyana relocated to Florida (after the Guyanese government allegedly seized ISS Guyana's hangar) and never returned.[1] Barker later formed ISS Wyoming—with Bell's knowledge—to lobby the United States to approve sales to Guyana, given that ISS Guyana, a foreign corporation, could not lobby the U.S. government.

ISS Guyana and ISS Wyoming's relationship with Bell at first seemed promising. In 2014, Barker and the ISS parties worked with Bell to achieve a non-binding indication from Canada, confirming its interest in financing up to three aircrafts for around $25 million. Barker also provided Bell with intelligence about Guyana's politics, corruption, and drug trade. And by 2017, the Guyana Defence Force was considering new Bell models as "replacement helicopters," and Barker confirmed to Bell in February 2017 that "all was in place to close our deal in early 2017."

But the ISS parties' initial promise faded. The anticipated 2017 deal was disrupted—due to corruption, say the ISS parties, and according to email records, helicopters were not the Guyana Defence Force's top priority and "the budget [did] not contemplate such a buy." Barker still anticipated moving towards a sales agreement, but Bell was growing increasingly concerned with ISS Guyana's lack of engagement—*i.e.*, failure to generate new leads and to further the potential three-helicopter sale—and failure to maintain a physical presence in the Agreement territory (Guyana).

---

[1] The Agreements required ISS Guyana to maintain an office in the covered territory.

B

In May 2018, Bell renewed ISS Guyana's Independent-Representative term for one year. However, Bell expressed it "[w]ould like to see more in-country involvement." The 2018 Agreement's term extended from August 15, 2018 to August 14, 2019. By amendment, Bell extended the term to September 30, 2019.

Under Article 4 of the 2018 Agreement, ISS Guyana's duties included: "[e]stablish[ing] and maintain[ing] an official place of business in the Authorized Territory"; "[o]btain[ing] offers from prospective customers to purchase Authorized Products" and "submit[ting] those offers to Bell"; and "[p]ay[ing] all costs and expenses incurred in the promotion and sale by the Representative of the Authorized Products and Services unless otherwise agreed to in writing by the Representative and Bell[.]"

Article 5 of the Agreement spelled out Bell's obligations:

a. Support Representative in its efforts to promote the sale of Authorized Products and Services in the Authorized Territory during the Term of Appointment; . . .

c. Generally render such sales assistance as may be, in Bell's sole judgment, reasonable and appropriate, without assuming any responsibility for Representative's sales efforts or any obligation to render assistance beyond what Bell, in its sole discretion, deems adequate; . . .

f. Compensate the Representative as provided in Article 6 of this Agreement.

Article 6 governed "Compensation." As relevant here, the Agreement provided that:

Bell will pay commissions to Representative . . . for the sale of Authorized Products and Services . . . provided that Representative has actively and substantially participated in the promotion of a particular sale in the Authorized Territory

as determined at the reasonable discretion of Bell, and the order is placed with Bell during the Term of Appointment[.] . . . Orders received outside of the Term of Appointment . . . will not be eligible to receive a commission, regardless of when such order was initiated unless otherwise agreed to by Bell under a separate written agreement.

C

By Spring 2019, Bell received a letter from the Multi-National Aviation Special Project Office (a division of the U.S. Army), on behalf of the Guyanese government, which requested pricing and availability for four helicopters through Foreign Military Sale procedures. Barker and ISS Guyana had no knowledge of the Foreign Military Sale prospect.

In response to the letter, Bell made another proposal to Guyana through its internal government-to-government team and without ISS Guyana. ISS Guyana contends that Bell "fell silent" and worked "behind [the ISS parties'] back to close the deal without ISS Guyana's involvement."

Javier Ortiz, Vice President of Bell, assured Barker that Bell expected a deal with Guyana to be completed during the term of the 2018 Agreement. As a result, Barker, ISS Guyana, and ISS Wyoming pressed ahead with work to further a deal with Guyana.

In August 2019, Bell advised Barker that it would not be renewing the Agreement. Bell did, however, suggest that it may consider granting prorated commissions on future sales if ISS Guyana "actively and substantially participated in the transaction prior to the expiration date of the subject Agreement." Bell repeatedly asked ISS Guyana to identify any potentially qualifying sales, but ISS Guyana never responded.

ISS Guyana's Agreement then expired on September 30, 2019. And its business never took off: ISS Guyana did not sell a single Bell helicopter during the six-plus-year relationship.

## D

In October 2020, after the 2018 Agreement expired, the United States approved the potential Foreign Military Sale of Bell helicopters to Guyana, worth approximately $256 million. However, that Foreign Military Sale never materialized, as the Guyanese government cancelled the sale proposal in January 2021.

Eventually, Guyana purchased two helicopters from Bell. The first sale occurred in December 2020. According to Bell, a year after the 2018 Agreement expired, Bell's new Independent Representative in Guyana learned that the newly-installed Guyanese National Security Advisor—with whom ISS Guyana had no contact during its term as Representative—sought to obtain a used Bell helicopter. A Bell regional sales manager approached the official to discuss the sale of a new Bell helicopter to the Guyana Defence Force, and in December 2020, the sale was completed for $9.5 million. Bell paid its new Representative commission. ISS Guyana sought commission, by email, for this sale in May 2022, and continues to seek commission for this sale now.

The second sale occurred in June 2022—nearly three years after the 2018 Agreement expired—for another $9.5 million. Bell again paid its new Representative commission. ISS Guyana now seeks commission for this sale.

## E

In August 2022, ISS Guyana filed suit in state court—which Bell later removed to federal court—and charged that Bell breached the 2018

Agreement by failing to pay commissions for the 2020 and 2022 sales to the Guyana Defence Force. ISS Guyana alleges it "actively and substantially participated in the promotion of" the sales through its six years as Bell's Representative, and Bell did not exercise "reasonable discretion" in determining whether to pay commissions, as required by the Agreement. According to ISS Guyana, it "performed all the work procuring a deal" with Guyana's government and defense force for the purchase of Bell helicopters and services, but Bell "deliberately ousted" them from the negotiations "with the finish line in sight . . . to avoid paying them commissions."

Bell moved to dismiss. The district court found that "any breach of contract claim based on an alleged failure of [Bell] to provide sufficient sales assistance regarding the Guyana Deal fails." *ISS Aviation, Inc. (Wyoming) v. Bell Textron, Inc.*, No. 4:22-CV-00689-O, 2023 WL 11822275, at *5 (N.D. Tex. May 30, 2023). It also found ISS Guyana's alternative claim for *quantum meruit* failed because Texas law precludes such claims where an express contract exists between the parties. *Id.* at *6–7. However, the court retained ISS Guyana's claim for breach of the implied duty to cooperate and ISS Wyoming's *quantum meruit*, promissory estoppel, and unjust enrichment claims. *Id.* at *12.

After discovery, Bell moved for summary judgment on the ISS parties' remaining claims. The district court found the implied duty to cooperate was "clearly [not] within the contemplation of the parties" and accordingly was not applicable under Texas law. *ISS Aviation, Inc. v. Bell Textron Inc.*, No. 4:22-CV-00689-O, 2024 WL 3086629, at *4–6 (N.D. Tex. Jan. 4, 2024). As to ISS Wyoming's claims, the district court ruled that the summary-judgment evidence did not "demonstrate that ISS Wyoming performed work or that Bell enjoyed that work" nor did it "demonstrat[e] how ISS Wyoming's lobbying led to any helicopter sales or provided any other benefits to Bell." *Id.* at *6.

ISS Guyana appeals its breach-of-contract, breach-of-implied-duty-to-cooperate, and *quantum meruit* claims. ISS Wyoming appeals its *quantum meruit* claim.

## II

We begin with ISS Guyana's claims which were dismissed at the motion-to-dismiss stage: (1) breach of contract, and (2) in the alternative, *quantum meruit*. We review *de novo* a district court's grant of a motion to dismiss. *See Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of complaints which "fail[] to state a claim upon which relief can be granted." Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). So ISS Guyana must plead "factual content that allows [us] to draw the reasonable inference that [Bell] is liable for the misconduct alleged." *Id.* Because the district court had jurisdiction based on diversity, we apply Texas substantive law. *See Smith v. Christus Saint Michaels Health Sys.*, 496 F. App'x 468, 470 (5th Cir. 2012) (per curiam) ("When the district court exercises diversity jurisdiction over a dispute, we apply the substantive law of the forum state, which in this case is Texas." (citation omitted)); *Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 626 (5th Cir. 2019) ("As this is a diversity case, [the court] interpret[s] the contract at issue under Texas law." (alterations in original) (citation omitted)).

At the motion-to-dismiss stage, we may consider contracts attached to the motion and central to the complaint. *See New Orleans City v. Ambac Assur. Corp.*, 815 F.3d 196, 200 (5th Cir. 2016). Here, that is the 2018 Agreement.

No. 24-10063

A

First, ISS Guyana revives its breach-of-contract claim. But its arguments on appeal are unavailing.

We review a district court's interpretation of a contract *de novo*. *See Franlink Inc. v. BACE Servs., Inc.*, 50 F.4th 432, 438 (5th Cir. 2022). Texas applies the "usual rules of construction" to commission contracts such as the 2018 Agreement. *Perthuis v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 236 (Tex. 2022) (quotation marks and citation omitted). Accordingly, our "primary objective is to ascertain and give effect to the parties' intent as expressed in" the 2018 Agreement. *URI Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018) (citations omitted). We refrain from rewriting or changing the 2018 Agreement under the guise of contract interpretation. *Weaver*, 939 F.3d at 627.

1

Because ISS Guyana seeks commissions, we start with Article 6(b), which governs compensation. Below, the district court found that Bell did not breach Article 6 because ISS Guyana, by its own allegations, sought commissions for sales occurring after the 2018 Agreement's term. We agree.

Article 6(b) only requires commissions for sales in which ISS Guyana

> has actively and substantially participated . . . *and* the order is placed with Bell *during the Term of Appointment . . . Orders received outside of the Term of Appointment . . . will not be eligible to receive a commission, regardless of when such order was initiated unless otherwise agreed to by Bell under a separate written agreement.*

*See* Art. 6(b) (emphasis added). The 2018 Agreement reiterated this limitation on commissions twice more. *See* Arts. 6(c)(8), 7(b).

The Texas Supreme Court has instructed that when a contract "authorize[s] commissions only on sales that close during the [contractual] relationship," like the 2018 Agreement here, the contracting parties' choice is binding. *Perthuis*, 645 S.W.3d at 237. As such, Bell could "freely provide [its] own rules for paying or withholding commissions" and was free to "deny the payment of commissions from procured sales absent continued employment; authorize commissions only on sales that close during the [contractual] relationship; [or] condition commissions on the money from the sale being received within a particular time frame." *Id.* at 236–37.

The contract here is unambiguous, and "at least in Texas, clear text = controlling text." *Weaver*, 939 F.3d at 627. So we honor Bell's—and ISS Guyana's—choice. The 2018 Agreement expired on September 30, 2019. And the only sales that took place were in December 2020 and June 2022—years after the expiration of ISS Guyana's Agreement. Bell even gave ISS Guyana an opportunity for potential commissions outside of these limitations by asking the Representative to identify potentially qualifying sales, and ISS Guyana failed to do so. Accordingly, Bell did not breach Article 6(b) of the 2018 Agreement.

2

To evade these contractual requirements for commissions, ISS Guyana argues that Bell breached Article 5(a) of the 2018 Agreement, which requires Bell to "[s]upport [ISS Guyana] in its efforts to promote the sale of Authorized Products and Services in the Authorized Territory during the Term of Appointment."

But Texas courts do not read contractual clauses in isolation; instead, Texas law requires that we interpret contracts as a whole and give effect to each provision. *See, e.g.*, *Matter of Pirani*, 824 F.3d 483, 493 (5th Cir. 2016) (applying Texas law); *Weaver*, 939 F.3d at 626 (same); *In re Serv. Corp. Int'l*,

355 S.W.3d 655, 661 (Tex. 2011) (Courts should "examine and consider the *entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." (emphasis in original) (citation omitted)). And we "must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or *section* of a contract." *Tex. v. Am. Tobacco Co.*, 463 F.3d 399, 408 (5th Cir. 2006) (emphasis added) (citation omitted) (applying Texas law). To that end, we look to Article 5(c) to help us determine whether Bell breached Article 5(a).

Both Articles 5(a) and 5(c) are subsections of the same Agreement section dedicated to Bell's duties. And the text of Article 5(c) refers back to Article 5(a): Although Article 5(a) requires Bell to "[s]upport [ISS Guyana] in its efforts to promote the sale of Authorized Products . . .", Article 5(c) clarifies that Bell will "[g]enerally render *such sales assistance* as may be, in Bell's sole judgment, reasonable and appropriate, without assuming any responsibility for Representative's sales efforts or any obligation to render assistance beyond what Bell, in its sole discretion, deems adequate" (emphasis added). *See, e.g.*, *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766 (2023) (commenting "[t]he word 'such' usually refers to something that has already been 'described'" and using at-issue section's context in the statute and surrounding language to define terms); *Escondido Res. II, LLC v. Justapor Ranch Co.*, No. 04-14-00905-CV, 2016 WL 2936411, at *3 (Tex. App.—San Antonio May 18, 2016, no pet.) (mem. op.) (describing "such" as reference to preceding sentences).

Accordingly, Article 5(c) narrows the scope of Bell's "support" duties to what is "reasonable and appropriate" in "Bell's sole judgment" and limits the assistance to what "Bell, it its sole discretion, deems adequate." *See Wal-Mart Stores, Inc. v. Xerox State & Local Sols., Inc.*, 663 S.W.3d 569, 587 (Tex. 2023) (reaffirming that "a specific contract provision

controls over a general one" (quoting *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019))). And in Texas, these kinds of sole-judgment or sole-discretion clauses are binding and enforceable. *See, e.g.*, *Culbertson v. Brodsky*, 788 S.W.2d 156, 157 (Tex. App.—Fort Worth 1990, writ denied); *Lewis v. Vitol, S.A.*, No. 01-05-00367-CV, 2006 WL 1767138, at *5 (Tex. App.—Houston [1st Dist.] June 29, 2006, no pet.) (mem. op.); *Kellermann v. Avaya, Inc.*, 530 F. App'x 384, 389 (5th Cir. 2013) (applying Texas law). Because Bell had "sole discretion" to determine what support to give, Bell did not breach Article 5 of the Agreement. Accordingly, the district court correctly dismissed ISS Guyana's breach-of-contract claim.

B

Second, ISS Guyana argues that the district court misapplied Texas law when it dismissed ISS Guyana's alternative claim for *quantum meruit*. Again, ISS Guyana's argument fails.

To begin, "*quantum meruit* is an equitable remedy which does not arise out of a contract, but is independent of it." *Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). For ISS Guyana to recover under *quantum meruit*, it must prove that "'(1) valuable services were rendered or materials furnished; (2) for the party sought to be charged; (3) which services and materials were accepted by the party sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, was expecting to be paid by the person sought to be charged.'" *Matter of KP Eng'g, L.P.*, 63 F.4th 452, 456 (5th Cir. 2023) (quoting *Vortt*, 787 S.W.2d at 944).

In Texas, recovery in *quantum meruit* is unavailable when an "express contract" exists between the parties. *Id.* (quoting *Vortt*, 787 S.W.2d at 944).

However, as ISS Guyana emphasizes, such recovery is permissible "when a plaintiff has partially performed an express contract but, because of the defendant's breach, the plaintiff is prevented from completing the contract." *Leasehold Expense Recovery, Inc. v. Mothers Work, Inc.*, 331 F.3d 452, 462 (5th Cir. 2003) (cleaned up) (quoting *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988)).

The district court dismissed ISS Guyana's *quantum meruit* claim because the 2018 Agreement covered "all the services performed by ISS Guyana" and thus barred recovery in *quantum meruit*. *ISS Aviation, Inc. (Wyoming)*, 2023 WL 11822275, at *7. Indeed, an "express contract" undisputedly exists between ISS Guyana and Bell, which outlined their respective duties and responsibilities for the term. So that contract bars ISS Guyana's recovery in *quantum meruit*, unless an exception applies.

But ISS Guyana's partial-performance-exception argument now before us does not rescue their claims. The district court never considered that argument because ISS Guyana never raised it. So we do not consider it either. *See, e.g.*, *Matter of KP Eng'g, L.P.*, 63 F.4th at 457 (finding party "forfeited [an] argument because it was alleged for the first time on appeal"); *Purselley v. Lockheed Martin Corp.*, 322 F. App'x 399, 404 (5th Cir. 2009) (finding that estoppel argument not raised in the district court was waived); *Cox Paving of Tex., Inc. v. H.O. Salinas & Sons Paving, Inc.*, 657 S.W.3d 756, 767 (Tex. App.—El Paso 2022, pet. denied) (discussing waiver of partial-performance exception). Even if this argument was not forfeited, the partial-performance exception does not apply. We already determined that Bell didn't breach the contract, and nothing suggests ISS Guyana was prevented from completing its end of the bargain. *See Leasehold Expense Recovery*, 331 F.3d at 462.

Accordingly, the district court correctly dismissed ISS Guyana's *quantum meruit* claim.

## III

We next turn to the claims resolved at the summary judgment stage: ISS Guyana's claim for breach of an implied duty to cooperate and ISS Wyoming's claim for *quantum meruit*. We review grants of summary judgment *de novo. See Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 216 (5th Cir. 2024). We affirm "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Jones v. New Orleans Reg'l Physician Hosp. Org.*, 981 F.3d 428, 432 (5th Cir. 2020) (citation omitted). We view the evidence in favor of the nonmovant—here, the ISS parties. *Id.* And we may "affirm a summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Diamond Servs. Corp. v. RLB Contracting, Inc.*, 113 F.4th 430, 438 (5th Cir. 2024) (citation omitted).

## A

We first address ISS Guyana's claim for breach of the implied duty to cooperate, for which the district court granted summary judgment to Bell.

The implied duty to cooperate "requires that a promisee" does not "hinder, prevent, or interfere with the promisor's ability to perform his duties under an agreement." *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 435 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (citing *Bagwell Coatings, Inc. v. Middle S. Energy, Inc.*, 797 F.2d 1298, 1305 n.6 (5th Cir. 1986)). But the implied duty to cooperate is just that—*implied*. And Texas law permits an implied duty, such as that to cooperate, when it rests "on the

presumed intention of the parties as gathered from the terms as *actually expressed in the written instrument itself*, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it. . . " *Universal Health Servs., Inc. v. Renaissance Women's Grp., P.A.*, 121 S.W.3d 742, 748 (Tex. 2003) (emphasis added) (citations omitted).[2] But there "can be no implied covenant as to a matter specifically covered by the written terms of the contract." *Bank One*, 967 S.W.2d at 434–35 (citation omitted).

The district court found that Article 5 of the 2018 Agreement defined Bell's cooperation obligation "to support ISS Guyana," and the court thus declined "to imply an additional duty to cooperate." *ISS Aviation, Inc.*, 2024 WL 3086629, at *5. We agree.

The 2018 Agreement expressly defined Bell's obligations—to "render such sales assistance as may be, in Bell's sole judgment, reasonable and appropriate." And the Agreement explicitly outlined ISS Guyana's obligations, too—to bring potential sales to Bell, and as the district court said, "[n]ot the other way around." *Id*. Indeed, Bell's decision to pursue the Foreign Military Sale proposal on its own—outside of the Direct Consumer Sale process and based on leads which ISS Guyana was unaware of—did not constitute a breach. ISS Guyana even admits as much—conceding that Bell

---

[2] ISS Guyana also seems to argue that Bell acted in bad faith. Even if ISS Guyana pleaded or appealed a claim for a breach of the implied duty of good faith—which it did not—Bell had no general duty to act in good faith under Texas law. *See, e.g.*, *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 369–70 n.13 (Tex. 2019) ("Under Texas law . . . contracting parties owe a good-faith duty only if they expressly agree to act in good faith, a statute imposes the duty, or the parties have a 'special relationship' like that between an insurer and insured."); *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983) (declining to adopt implied covenant of "good faith and fair dealing"); *Culbertson*, 788 S.W.2d at 157 (rejecting good-faith argument where contract afforded one party sole discretion).

had no obligation to involve it in the Foreign Military Sale proposal. Accordingly, the Agreement defined the extent of "cooperation" required of both parties. *See, e.g.*, *Chapman Children's Tr. v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 437 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) ("Because the parties specifically contracted the extent of their duty to cooperate, . . . we decline to imply additional duties in this instance."); *Estate of Rashti v. Bank of Am. Nat'l Ass'n*, 782 F. App'x 322, 326 (5th Cir. 2019) (applying Texas law). We can imply nothing more or nothing less, and we will not read into the contract additional, heightened duties just to "make the contract fair, wise, or just" in ISS Guyana's view. *Bank One*, 967 S.W.2d at 434; *see also In re Bass*, 113 S.W.3d 735, 743 (Tex. 2003) ("[I]mplied covenants are not favored by law and will not be read into contracts except as legally necessary to effectuate the plain, clear, unmistakable intent of the parties.").

ISS Guyana makes much noise about its groundwork and contributions to Bell's eventual helicopter sales to Guyana. But even if we were to imply a duty to cooperate, Bell's efforts to sell helicopters outside of the Independent-Representative relationship never hindered, prevented, or interfered with ISS Guyana's efforts to perform its obligations. As the district court correctly emphasized, "[t]he 2018 Agreement did not guarantee ISS Guyana access to all deals in the Guyana region or protection in Guyana." *ISS Aviation, Inc.*, 2024 WL 3086629, at *5. It merely required Bell to assist, as "reasonable and appropriate" in Bell's "sole discretion," in the sales that ISS Guyana pursued or obtained.

Finally, even assuming the implied duty to cooperate applied—though it does not—no evidence suggests ISS Guyana was entitled to damages for any alleged breach. First, the Foreign Military Sale for four helicopters never materialized. And even if ISS Guyana was involved in initiating that sale, ISS Guyana was never entitled to commissions for sales

that never occurred. Second, the 2020 sale resulted from a new regime's interest in purchasing a helicopter, a new Independent Representative's lead—with whom ISS Guyana had no prior contact—and Bell's outreach. ISS Guyana points to no evidence that ISS Guyana would have closed that sale, or the 2022 sale, prior to the end of the 2018 Agreement. Because ISS Guyana relies on "mere conclusory allegations" that are "not competent summary judgment evidence," its allegations are "insufficient, therefore, to defeat a motion for summary judgment." *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (per curiam). As such, the district court properly granted Bell summary judgment on ISS Guyana's implied-duty claims.

B

Finally, we turn to ISS Wyoming's *quantum meruit* claims. Just as the district court found, ISS Wyoming has "failed to . . . establish a fact issue for two elements of this claim: ISS Wyoming's performance of work and enjoyment of work by Bell." *ISS Aviation, Inc.*, 2024 WL 3086629, at *6.

ISS Wyoming's single-paragraph argument fails to provide any "genuine dispute" of material fact to survive summary judgment. FED. R. CIV. P. 56(a). The only thing ISS Wyoming—and the record evidence on which it relies—shows is that Bell was aware of ISS Wyoming. Indeed, in the district court's words, ISS Wyoming has presented no evidence that the "lobbying led to any helicopter sales or provided any other benefits to Bell." *ISS Aviation*, 2024 WL 3086629, at *6. Critically, even if Bell, as ISS Wyoming argues, "supported ISS Wyoming's formation and lobbying for Bell," Bell did not ask Barker or ISS Guyana to form ISS Wyoming, nor did Bell promise or expect to compensate ISS Wyoming in exchange for any lobbying efforts. *See LTS Grp., Inc. v. Woodcrest Cap., L.L.C.*, 222 S.W.3d 918, 920 (Tex. App.—Dallas 2007, no pet.) ("Quantum meruit is an equitable theory of recovery which is based on *an implied agreement to pay for*

*benefits received.*" (emphasis added)). And as Bell emphasizes, "ISS Wyoming supplied services, if at all, to further its own business interests—specifically, to assist ISS Guyana sales-promotion efforts so that ISS Guyana, which ISS Wyoming (and ultimately Barker) owns, might earn commissions." Because ISS Wyoming's efforts were to support a "future business advantage or opportunity"—sales of Bell helicopters, and accordingly, commissions from those sales—there is no basis for "a cause of action in quantum meruit." *Peko Oil USA v. Evans*, 800 S.W.2d 572, 577 (Tex. App.—Dallas 1990, writ denied) ("Quantum meruit relief cannot be obtained where the benefit is conferred officiously or gratuitously or where the services were rendered to gain a business advantage or where the defendant could not have reasonably believed that the plaintiff expected a fee."); *see, e.g.*, *FDIC v. Plato*, 981 F.2d 852, 858 n.14 (5th Cir. 1993) (affirming denial of *quantum meruit* damages where defendant did not ask for and was unaware of benefit conferred); *Blanchard v. Via*, No. 5:20-CV-170-BQ, 2022 WL 1018645, at *5 (N.D. Tex. Apr. 5, 2022) (applying Texas law) (collecting cases applying the rule that expectation of future business advantage cannot form the basis of *quantum meruit* claim), *aff'd*, No. 22-10458, 2023 WL 3316326 (5th Cir. May 9, 2023). ISS Wyoming hasn't provided evidence that a fact dispute exists as to whether there were either "services rendered" to or benefits "enjoyed" by Bell sufficient to defeat a motion for summary judgment.

Accordingly, the district court properly granted summary judgment to Bell on ISS Wyoming's *quantum meruit* claim.

\*\*\*

We AFFIRM the district court's grant of summary judgment to Bell and its dismissal of the ISS parties' breach-of-contract, breach-of-implied-duty-to-cooperate, and *quantum meruit* claims.